IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


JAMES WILLIAM HESLEP and
CAREY WATERS HESLEP,

            Plaintiffs,


v.                          //    CIVIL ACTION NO. 1:11CV56
                                  (Judge Keeley)


AMERICANS FOR AFRICAN
ADOPTION, INC. and
CHERYL CARTER-SHOTTS,

            Defendants.


MEMORANDUM OPINION AND ORDER
GRANTING-IN-PART AND DENYING-IN-PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]

Pending before the Court is the motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 by the defendants, Cheryl Carter-Shotts ("Carter-Shotts") and Americans for African Adoption, Inc. ("AFAA") (collectively "the defendants"). For the reasons that follow, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the defendants' motion. (Dkt. No. 109).

## I. Factual Background

In 2007, the plaintiffs, James Heslep ("Mr. Heslep") and his wife, Carey ("Mrs. Heslep") (collectively "the plaintiffs" or "the Hesleps"), decided to adopt a child from a foreign country. After independently researching various agencies and relying on

MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]

representations and assurances made by Carter-Shotts, the Hesleps

selected AFAA, an Indiana-registered nonprofit organization led by

Carter-Shotts, to facilitate the adoption process. (Heslep Dep.).[1]

At the time they began working with AFAA and Carter-Shotts,

the Heseleps understood that AFAA had been operating an orphan

guardianship program in Uganda since 1991 (dkt. no. 110-5 at 2) in

association with a local social worker named Joseph Kagimu

("Kagimu"). Although Kagimu never received what could be called a

salary, AFAA held him out to others as an "employee[]" and a member

of its "staff." (Dkt. No. 110-19). It also granted him exclusive

possession of AFAA property, including a laptop computer, and

---

[1] Both parties cite to the deposition of James Heslep, which was recorded nonstenographically, throughout their briefing. To the extent the Court was able to review portions of the deposition recording, it provides general citations to the same within this opinion. It notes, however, that the parties were required to provide the Court with a transcript in order to use the deposition on a motion for, or a brief in opposition to, summary judgment. See Fed. R. Civ. P. 32(c) ("Unless the court orders otherwise, a party must provide a transcript of any deposition testimony the party offers, but may provide the court with testimony in nontranscript form as well."); Fed. R. Civ. P. 32(c), Advisory Committee's Notes on 1993 Amendment ("Under this rule a party may offer deposition testimony in any of the forms authorized under Rule 30(b) but, if offering it in a nonstenographic form, must provide the court with a transcript of the portions so offered."); Fed. R. Civ. P. 30(b), Advisory Committee's Notes on 1993 Amendment ("A party choosing to record a deposition only by videotape or audiotape should understand that a transcript will be required by Rule 26(a)(3)(B) and Rule 32(c) if the deposition is later to be offered as evidence at trial or on a dispositive motion under Rule 56."); see also L.R. Civ. P. 7.02(a) ("All motions . . . shall be accompanied . . . by copies of depositions (or pertinent portions thereof) . . . upon which the motion relies.").

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

maintained a cooperative relationship with him for approximately eight years. <u>See</u> (Dkt. No. 111-3 at 19). During this time, Kagimu and his family personally cared for a number of the children involved in AFAA's guardianship program, and AFAA paid them for the children's lodging, meals and medical care. <u>Id.</u>

In 2007, Kagimu notified Carter-Shotts that, in a departure from its past policy, the Ugandan government soon intended to allow foreigners to adopt Ugandan orphans. (Dkt. No. 110-7 at 1). In order to take advantage of this new adoption opportunity, Carter-Shotts directed Kagimu to incorporate AFAA within Uganda. By the end of 2007, Kagimu had sent Carter-Shotts a "Reservation of Name" form (dkt. no. 110-10), as well as a certificate of incorporation issued to AFAA Uganda by the Republic of Uganda. (Dkt. No. 110-12). Based on these documents, Kagimu advised Carter-Shotts that AFAA could proceed to conduct adoptions in Uganda. (Dkt. No. 110-7 at 1).

On November 6, 2007, the Hesleps, working with AFAA, agreed to serve as a test case for its nascent Ugandan adoption program. (Dkt. No. 110-15, 110-16). According to AFAA's plan, adoptive families such as the Hesleps would first obtain guardianship of an

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

orphan child from the Ugandan government and then adopt the child in the United States. (Dkt. No. 110-15).

The parties dispute when and how the Hesleps learned from AFAA that a young Ugandan boy named James K. was available for adoption. Relying on a form completed by Kagimu that Carter-Shotts or AFAA forwarded to the Hesleps (dkt. no. 110-17), the defendants maintain that the Hesleps first learned about James K. on November 10, 2007. (Dkt. No. 110 at 4). The Hesleps dispute this, claiming they first learned about James K. on May 10, 2008, when Carter-Shotts telephoned to tell them about him. (Dkt. No. 111 at 3). In any event, it is undisputed that, after learning about James K., the Hesleps agreed to adopt and sponsor him pursuant to AFAA's plan. That plan obligated them to pay AFAA $200.00 per month to provide James K. with housing, food, medical care, and schooling. (Heslep Dep.).

Mr. Heslep contends that, during this process, Carter-Shotts told him James K. was approximately eighteen months old, his biological father had been killed on military duty, and his biological mother had died in an accident. (Heslep Dep.). He claims that Carter-Shotts had not investigated James K.'s background or

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

orphan status when she made these representations. (Dkt. Nos. 111 at 3-4, 111-3 at 30-31).

Later, when AFAA provided James K.'s birth certificate to the Hesleps, they learned for the first time that he was older than the eighteen months represented by Carter-Shotts. (Dkt. No. 111-4). An AFAA employee acknowledged the inaccuracy but stated: "[Carter-Shotts] wanted me to refer you to her 12/16/08 email, where she posted what Joseph [Kagimu] told her about the [birth certificate]. . . . We know [the age] is not accurate, but once it's been issued, it goes." Id.

Throughout 2008 and 2009, Carter-Shotts traveled to Uganda on several occasions to investigate the reason for delays in the Ugandan adoption process. While there, in April 2008, she met with an attorney retained by Kagimu to assist in the adoption process. (Dkt. No. 110-7 at 2). Dissatisfied with that attorney's services, Carter-Shotts directed Kagimu to replace him. Id. Pursuant to Carter-Shotts's directive, Kagimu selected Hamza Sebuta ("Sebuta"), who later informed Carter-Shotts that Kagimu was the source of the delays in the adoption process. (Dkt. No. 110-20 at 2).

Nearly two years after first agreeing to adopt a Ugandan child with the assistance of AFAA, the Hesleps severed their ties with

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

the agency on September 8, 2009, giving as their reason Carter-Shotts' poor communication and financial mismanagement of AFAA. (Dkt. No. 110-26 at 1). Mr. Heslep informed Carter-Shotts "we want no further contact with you or AFAA." Id.

In an effort to advance their adoption of James K. without the assistance of AFAA, the Hesleps contacted Kagimu and Sebuta directly (dkt. nos. 110-23, 110-24), and traveled to Uganda on September 11, 2009, where Kagimu placed James K. in their care. Six days later, on September 17, 2009, relying on documentation prepared by Kagimu and Sebuta that purported to establish James K.'s orphan status, a Ugandan court named the Hesleps as James K.'s legal guardians. (Dkt. No. 110-31 at 5).

After obtaining legal guardianship, the Hesleps applied to the United States Embassy in Kampala, Uganda for an IR-4 visa for James K. (Dkt. No. 110-42 at 1). Alerted by discrepancies in the paperwork provided by Sebuta and Kagimu, however, the Embassy investigated James K.'s background and concluded that "Kagimu [had] forged documents related to the death certificates" of James K.'s parents. (Dkt. No. 110-38 at 1). Those death certificates indicated that both parents were "stone minners [sic]" who had died of natural causes. Id. Mr. Heslep, however, repeating information

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

provided by Carter-Shotts, advised the Embassy that James K.'s
father had been killed while serving in the military, and that his
mother had died as the result of an accident. (Heslep Dep.). Given
the discrepancies in James K.'s case history, the Embassy froze all
AFAA-facilitated adoptions in Uganda. Id.

Still intent on adopting James K., the Hesleps turned to the
United States Citizenship and Immigration Services ("USCIS") to
secure his legal entry into the United States via an I-600 Petition
to Classify Orphan as an Immediate Relative. (Dkt. No. 111-8 at 1).
On February 12, 2010, USCIS issued a Notice of Intent to Deny
("NOID") the Hesleps' I-600 petition because its own investigation
concluded that the Hesleps had failed to establish James K's status
as a true orphan. Id. at 3.

The NOID concluded that "evidence confirms that AFAA knowingly
and admittedly provided false death certificates for the birth
parents of" James K. Id. Additionally, it stated that AFAA "had no
legal standing in Ugandan Courts, and had no legal authority to
care for, house, or assist in this adoption." Id. USCIS issued
nearly identical NOIDS to three other families who also had been
attempting to adopt Ugandan children with AFAA's help. (Dkt. No.
111-9). After their own investigation confirmed that James K. was

7

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

not an orphan, the Hesleps relinquished guardianship and returned him to the care of his maternal grandmother. (Dkt. No. 111 at 7-8).

Meanwhile, due to the issues regarding AFAA's corporate status that were raised by the Ugandan court during the Hesleps' guardianship hearing, Carter-Shotts inquired of Sebuta and learned that AFAA'a Ugandan corporate registration was improper. (Dkt. No. 110-32 at 1). Although she flatly denies any prior knowledge about this issue, Carter-Shotts does acknowledge that Kagimu told Sebuta she in fact knew of it. Id. Ultimately, on September 30, 2009, Carter-Shotts properly re-registered AFAA as a Ugandan corporation (dkt. no. 110-33 at 15), and it continues to operate an orphanage in Uganda to this day. (Dkt. No. 110 at 10).

## II. Procedural Background

The Hesleps sued AFAA, Carter-Shotts, and AFAA's board of directors on April 25, 2011. Their complaint asserted nine causes of action: (1) violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 and 1962, (2) fraudulent misrepresentation and inducement, (3) intentional infliction of emotional distress ("outrage"), (4) negligent hiring, (5) negligent supervision, (6) negligent retention, (7) negligent administration of a program, (8) negligent infliction of emotional

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

distress ("NIED"), and (9) punitive damages. Earlier in this case, the Court dismissed AFAA's board of directors as well as Counts Five, Seven, and Eight of the complaint. The Hesleps' claims for RICO violations, fraud, outrage, and negligent hiring and retention remain and are the subject of the pending motion for summary judgment.

### III. Legal Standard

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(1)(A), (a). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. <u>Providence Square Assocs., L.L.C. v. G.D.F., Inc.</u>, 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. <u>Id.</u> at 248–52.

### IV. Analysis

### A. Count One - RICO, 18 U.S.C. § 1962(c)

AFAA and Carter-Shotts contend that the Heslep's' civil racketeering claims in Count One of the complaint fail both as a matter of law and for want of any evidentiary support. Subsections (a) and (c) of 18 U.S.C. § 1964 of the RICO Act provide civil remedies for violations of § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

<u>Id.</u> § 1962(c). Thus, the Heslesps' RICO claim requires them to plead and prove the following four elements: (1) conduct (2) of an "enterprise", (3) through a pattern (4) of racketeering activity. <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496 (1985).

The Court turns first to the defendants' argument that the Heslesps have failed to establish a "person" distinct from the RICO-violating "enterprise." "[T]o establish liability under § 1962(c), one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 161 (2001); <u>see also</u> <u>United States v. Computer Sci. Corp.</u>, 689 F.2d 1181, 1190 (4th Cir. 1982), <u>overruled in part by</u> <u>Busby v. Crown Supply, Inc.</u>, 896 F.2d 833 (4th Cir. 1990) (en banc) ("We conclude that 'enterprise' was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit, and, failing that, to punish."). An "enterprise" consists of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

although not a legal entity." 18 U.S.C. § 1961(4).[2] In other words, RICO "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Myers v. Lee, No. 1:10CV131, 2010 WL 3745632, at *3 (E.D. Va. Sept. 21, 2010) (quoting Reves v. Ernst & Young, 507 U.S. 170, 185 (1993)) (emphasis in the original).

The Hesleps claim they have established a legally distinct "enterprise" under Cedric Kushner, arguing that the facts of this case "are directly analogous to the facts presented" there. (Dkt. No. 111 at 12). In Cedric Kushner, however, the Supreme Court considered a claim that a "corporate employee [was] the 'person' and the corporation [was] the 'enterprise,'" 533 U.S. at 164 (emphasis added), and held that the distinctness element of § 1962(c) is satisfied when a "corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner – whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." 533 U.S. at 166. The Hesleps' complaint, in contrast, alleges that AFAA is the "person"

---

[2]     For RICO purposes, a corporation may constitute a "person." Cedric Kushner, 533 U.S. at 163 ("the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner").

MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]

(i.e., the defendant) for RICO purposes (dkt. no. 3 at ¶ 77), and that an "association in fact" formed by Carter-Shotts, Kagimu, AFAA board members, and AFAA is the "enterprise." Id.

The Hesleps, in short, misapprehend Cedric Kushner's applicability in this case. In order to fall squarely within the four corners of Cedric Kushner, the Hesleps would have had to allege that Carter-Shotts, or another AFAA employee, was the "person" and that AFAA was the "enterprise," which they failed to do. Moreover, the Supreme Court in Cedric Kushner expressed dubiousness about the sort of RICO relationship alleged here, distinguishing "earlier Second Circuit precedent concern[ing] a claim that a corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise,'" and stating that "[i]t is less natural to speak of a corporation as 'employed by' or 'associated with' this latter oddly constructed entity." 533 U.S. at 164. Contrary to the plaintiffs' arguments, then, the RICO relationship alleged in the complaint is not analogous to that in Cedric Kushner. Id.

The Hesleps also have provided no evidence tending to establish that the alleged "association in fact" composed of AFAA, Carter-Shotts, Kagimu, and AFAA board members acted with a common

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

purpose and therefore was distinct from AFAA. See (Dkt. No. 111 at
12). A common purpose is "essential to proof of such an entity's
'separate' existence." United States v. Griffin, 660 F.2d 996, 999
(4th Cir. 1981). Indeed, the Hesleps' response cuts against such a
conclusion. They represent that all members of the "association in
fact" acted within the scope of their employment with AFAA, (dkt.
No. 111 at 12), and repeatedly conflate the actions taken by the
alleged "association in fact" with those of AFAA, the RICO
"person." See generally Arguaga-Collazo v. Oriental Federal Savings
Bank, et al., 913 F.2d 5, 6 (1st Cir. 1990) (Breyer, C.J.) ("[A]n
'enterprise' does not 'conduct and participate . . . in the conduct
of' that same enterprise's affairs.") (emphasis omitted).

Essentially, as the Hesleps have presented an "enterprise"
that is simply AFAA by a different a name, they accuse AFAA of
conducting its own affairs – and not those of a distinct enterprise
– in a RICO-forbidden way. Such an allegation, however, will not
satisfy the statute's distinctness requirement. See Myers, 2010 WL
3745632, at *3 (quoting Reves, 507 U.S. at 185); see also Whelan v.
Winchester Production Co., 319 F.3d 225, 229 (5th Cir. 2003) ("That
officers or employees of a corporation, in the course of their
employment, associate to commit predicate acts does not establish

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

an association-in-fact enterprise distinct from the corporation.");

In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig., 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011) (allegations that "[d]efendants are associated in a manner directly related to their own [fraudulent] primary business activities" did not satisfy distinctness requirement); Myers, 2010 WL 3745632, at *4 (distinctness requirement unmet where there was "complete overlap between the defendants, their alleged agents, and the enterprise"); cf. Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 362 (9th Cir. 2005) (holding that "association in fact" litigation enterprise formed by the corporation — the RICO person — and its legal counsel was a distinct entity).

While the Hesleps' allegations at the pleading stage may have been sufficient to withstand an earlier motion to dismiss, they have wholly failed to meet their burden at summary judgment. Rather than "set[ting] forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, the Hesleps merely assert that:

> Plaintiffs alleged that multiple individuals acted
> through the guise of the corporate defendant to commit
> various criminal acts. Testimony elicited from Defendant
> Shotts and documents discovered by the Plaintiff support

15

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

> the contention that Shotts, Kagimu, Sebuta, and the
> members of the board of directors all acted within the
> scope of their employment with AFAA to further a RICO
> enterprise.

(Dkt. 111 at 12).

"Unsubstantiated allegations carry no probative weight in
summary judgment proceedings." Cypert v. Indep. Sch. Dist. No. I-
050 of Osage County, 661 F.3d 477, 481 (10th Cir. 2011). The
Hesleps may not rest on allegations in their complaint when the
defendants have clearly pointed to the absence of any evidence that
the "association in fact" shared a common purpose distinct from
that of AFAA, the RICO "person." The plaintiffs have cited to no
statement in Carter-Shotts' deposition, nor identified any exhibit
in the eleven attached to their response brief, that would tend to
establish that the constituents of the association actually shared
a common purpose and maintained an existence that was in any way
distinct from AFAA itself. See Fed. R. Civ. P. 56(c)(1) ("A party
asserting that a fact cannot be or is genuinely disputed must
support the assertion by [] citing to particular parts of materials
in the record . . . .").

At bottom, the Hesleps have not raised a genuine issue of
material fact as to the common purpose of the alleged "association
in fact" that would tend to establish an "enterprise" distinct from

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

AFAA. Because "[c]ourts are in agreement that for the purposes of liability under Section 1962(c), a RICO person must be distinct from the RICO enterprise," <u>Myers</u>, 2010 WL 3745632, at *3 (citing <u>Palmetto State Med. Center, Inc. v. Operation Lifeline</u>, 117 F.3d 142, 148 (4th Cir. 1997)), the defendants are entitled to summary judgment as to Count One, RICO.

### B. Count Two - Fraud

As to Count Two of the Complaint, Fraud, the defendants assert that there is no material fact in dispute concerning the allegedly fraudulent nature of seven statements made to the Hesleps by Carter-Shotts and AFAA. The Hesleps contend the factual record supports their claim.

Under West Virginia law, the essential elements in an action for fraud are as follows:

> (1) that the act claimed to be fraudulent was the act of
> the defendant or induced by him; (2) that it was material
> and false; that plaintiff relied upon it and was
> justified under the circumstances in relying upon it; and
> (3) that he was damaged because he relied upon it.

Syl. pt. 1, <u>Lengyel v. Lint</u>, 280 S.E.2d 66, 67 (W. Va. 1981). "Actual fraud is intentional, and consists of intentional deception to induce another to part with property or to surrender some legal

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

right, and which accomplishes the end designed." <u>Stanley v. Sewell</u>
<u>Coal Co.,</u> 285 S.E.2d 679, 683 (W. Va. 1981).

The crux of the defendants' argument is that Carter-Shotts
acted in reasonable reliance on Kagimu's misrepresentations and
that she, and therefore AFAA, never intentionally sought to deceive
the Hesleps about James K.'s status as an orphan or AFAA's ability
to place lawful adoptions in Uganda. The Hesleps, however, point to
more than a scintilla of evidence from which a reasonable jury
could conclude that Carter-Shotts and AFAA intentionally deceived
them. First, the NOID issued by USCIS supports the Hesleps'
contention that statements by Carter-Shotts concerning AFAA's
ability and authority to conduct Ugandan adoptions and James K.'s
orphan status were patently false. (Dkt. No. 111-8). Second, AFAA
and Carter-Shotts' acceptance of James K.'s inaccurate birth
certificate raises a reasonable inference that the defendants may
have been aware of misrepresentations on other important documents
pertaining to the adoption of James K. (Dkt. No. 111-4).

Nor is the Hesleps' claim doomed by the fact that AFAA never
guaranteed them a successful adoption. Considering the findings in
the NOID regarding AFAA's legal status and inability to place
lawful adoptions in Uganda, a reasonable jury could conclude that

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

Carter-Shotts and AFAA intentionally deceived the Hesleps by leading them to believe AFAA could "competently and legally handle the legal process of a Ugandan adoption." (Heslep Dep.). In short, there are genuine issues of material fact about the intentionally deceptive nature of certain acts and statements by AFAA and Carter-Shotts. The defendants therefore are not entitled to summary judgment as to Count Two, Fraud.

### C. Count Three - Outrage

As to Count Three, Outrage, the defendants assert that the Hesleps have no evidence that Carter-Shotts acted with the requisite intent to inflict emotional distress. They further contend that the record is replete with evidence of Carter-Shotts' attempts to assist the Hesleps even after learning of Kagimu's deception. The Hesleps' sole response to this argument is to narratively describe the depth of their emotional despair following the loss of James K.

To state a claim of outrage in West Virginia, a plaintiff must establish the following four elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain

emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Travis v. Alcon Labs., Inc., 504 S.E.2d 419, 425 (W. Va. 1998).

The "tort of outrage is a difficult fact pattern to prove." Garrett v. Viacom, Inc., No.1:03CV22, 2003 WL 22740917, at *3 (N.D.W. Va. Aug. 27, 2003). West Virginia's highest court has characterized the tort as a "slippery beast, which can easily get out of hand without firm judicial oversight." Tanner v. Rite Aid of West Virginia, Inc., 461 S.E.2d 149, 157 (W. Va. 1995) (quoting Keyes v. Keyes, 392 S.E.2d 693, 696 (W. Va. 1990)).

The Hesleps' failure to respond to the defendants' argument is determinative of the matter. Rather than address the issue of Carter-Shotts' intent, the Heseleps elected to emphasize the severity of their distress at the loss of James K. While one may certainly sympathize with the Heseleps' plight, the severity of their distress is but the last of four separate elements necessary to prove the tort of outrage. In the absence of any argument or evidence to the contrary, then, the Court is left with a gap in the record and the undisputed evidence that, throughout 2008 and 2009,

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

Carter-Shotts and AFAA staff traveled to Uganda several times in an effort to assist Kagimu with the adoption process.

Therefore, the Heslops have failed to meet their burden as to the second element of intent, see Anderson, 477 U.S. at 256, and the defendants are entitled to summary judgment as to Count Three, Outrage.

### D. Counts Four and Six: Negligent Hiring and Retention

Counts Four and Six of the Complaint allege negligent hiring and retention. According to the defendants, these claims fail because, under West Virginia's four-factor test for respondeat superior, see Syl. pt. 5, Paxton v. Crabtree, 400 S.E.2d 245 (W. Va. 1990), the Heslops have failed to establish that Kagimu was an employee of AFAA. The Heslops challenge this conclusion, contending there are material facts in dispute about Kagimu's employment status.

West Virginia recognizes a cause of action based on negligent hiring and retention. McCormick v. W. Va. Dep't of Pub. Safety, 503 S.E.2d 502, 506–07 (W. Va. 1998); State ex rel. West Virginia State Police v. Taylor, 499 S.E.2d 283, 289 n. 7 (W. Va. 1997). In order to determine whether a defendant has negligently hired and retained an employee, a court should consider the following:

> when the employee was hired or retained, did the employer
> conduct a reasonable investigation into the employee's
> background vis a vis the job for which the employee was
> hired and the possible risk of harm or injury to
> co-workers or third parties that could result from the
> conduct of an unfit employee? Should the employer have
> reasonably foreseen the risk caused by hiring or
> retaining an unfit person?

McCormick, 503 S.E.2d at 506. Thus, an employer-employee relationship is a necessary element of both the negligent hiring and retention causes of action.

Whether an employer-employee relationship exists depends on several factors: "(1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative." Syl. pt. 5, Paxton, 400 S.E.2d at 245. Proof of such a relationship may be "inferred from the facts and circumstances, including conduct." Womack v. Wells Fargo Bank, N.A., No. 1:11CV104, 2011 U.S. Dist. LEXIS 154324 (N.D.W. Va. Nov. 7, 2011) (quoting General Elec. Credit Corp. v. Fields, 133 S.E.2d 780, 783 (W. Va. 1963)).

**(1)**

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

Regarding the first factor, selection and engagement, the defendants argue that AFAA never actually selected Kagimu because he was the one who sought out AFAA. (Dkt. No. 110-6). While there is evidence that may have been the case initially, AFAA clearly formed some type of relationship with Kagimu that lasted nearly eight years. Cf. Cunningham v. Herbert J. Thomas Mem'l. Hosp. Ass'n, 737 S.E.2d 270 (W. Va. 2012) (per curiam) (finding selection factor unsatisfied where independent contractors, not defendant hospital, selected physicians); France v. S. Equip. Co., 689 S.E.2d 1, 7 (W. Va. 2009) (finding selection factor unsatisfied where the defendant did not select sub-contractor of general contractor). AFAA not only chose to associate with Kagimu over an extended period of time, there also is more than a scintilla of evidence that it held him out to prospective adoptive families, including the Hesleps, as an AFAA employee. (Dkt. No. 111-1). Thus, a reasonable jury could conclude that AFAA selected and engaged Kagimu, despite the fact that it was he who first approached the organization.

**(2)**

As to the second factor, compensation, the defendants contend that AFAA never paid Kagimu a salary. Carter-Shotts, however,

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

testified that AFAA gave Kagimu a computer, printer, and travel money. (Dkt. No. 111-3 at 19, 24). Additionally, AFAA housed foster children with Kagimu and paid him at least a portion of the children's sponsorship fees. Id. at 19. Furthermore, in its records, AFAA claimed fifty-one paid, African employees in 2009. Id. While Carter-Shotts testified that Kagimu was the sole AFAA country representative who did not receive a salary for his efforts on behalf on AFAA, the fact that this situation is such an anomaly among the AFAA's African affiliates could, when all reasonable inferences are drawn in favor of the Hesleps, arouse suspicion in the mind of a reasonable juror. Therefore, a question of material fact exists about whether the benefits provided to Kagimu by AFAA served as a compensation.

**(3)**

With regard to the third factor, power of dismissal, the defendants' circular argument that AFAA could not terminate Kagimu because it never employed him is unpersuasive. As to their contention that AFAA could not terminate Kagimu because he intimidated Carter-Shotts and controlled the Ugandan orphans who were placed in AFAA's care, the Hesleps have offered an effective rebuttal: Carter-Shotts's report to an AFAA listserve on November

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

16, 2009, that she had "two new people in mind that [she] believe[d] would] do a good job as a country representative and a deputy assistant." (Dkt. No. 110-44 at 3). Although her internet post did not specifically mention Kagimu, when all inferences are drawn in favor of the Hesleps, a reasonable jury could conclude that Carter-Shotts not only had the power but also the intent to terminate AFAA's relationship with Kagimu and replace him as AFAA's Uganda country representative.

**(4)**

As to the fourth and most important factor, control, the defendants emphasize that Carter-Shotts exerted no control over Kagimu's actions. They focus on his failure to comply with her directions to register AFAA as an Ugandan organization, to improve the organization of the AFAA-Uganda operation, and, later, to cease communicating directly with AFAA-affiliated families. The defendants also offer Carter-Shotts' testimony that Kagimu told her he does not work <u>for</u> AFAA, but rather <u>with</u> AFAA. (Dkt. No. 110-43 at 11). In response, the Hesleps argue that AFAA and Carter-Shotts issued numerous instructions to Kagimu regarding the hiring of Ugandan staff, identification of orphaned children, preparation of

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

documents, and interaction with government officials to pursue international adoptions.

Despite Kagimu's alleged statement to the contrary, the power of attorney that AFAA provided to the Hesleps in 2008 (dkt. no. 111-1) supports the inference that AFAA held Kagimu out as its employee and staff member. On its face, this document contradicts Carter-Shotts' assertion that she lacked the ability to control Kagimu. Further evidence of control also can be found in the AFAA/Uganda Program statement that AFAA had worked in Uganda since 1991 "with direction from the US and in-country Ugandan social worker." (Dkt. No. 110-5 at 2). While that statement alone might not be determinative, when considered together with all the other evidence in the record of AFAA and Kagimu's relationship, it could lead a reasonable jury to conclude that AFAA exerted control over Kagimu's activities in Uganda. That other evidence includes the specific instructions Carter-Shotts issued to Kagimu on several occasions, directing him, for example, to take all Ugandan foster children for medical tests to determine their ages. (Dkt. No. 110-11 at 1). She also instructed him to fire one attorney and hire another. (Dkt. No. 110-7 at 2).

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

At bottom, the evidence regarding the determinative issue of whether Kagimu was an employee or independent contractor of AFAA is in conflict. The Supreme Court of Appeals of West Virginia has held that a defendant has the "burden of establishing that he neither controlled nor had the right to control the work, and if there is a conflict in the evidence and there is sufficient evidence to support a finding of the jury, the determination of whether an independent contractor relationship existed is a question for jury determination." Syl. Pt. 6, <u>Cunningham</u>, 737 S.E.2d 270 (quoting Syl. pt. 1, <u>Sanders v. Georgia-Pacific Corp.</u>, 225 S.E.2d 218 (W. Va. 1976)); <u>see also</u> <u>Rawls v. Associated Materials, LLC</u>, No. 1:10CV01272, 2012 WL 3852875, at *4 (S.D.W. Va. Sept. 5, 2012) ("Whether an agency relationship exists is a factual question."(citing <u>Harper v. Jackson Hewitt, Inc.</u>, 706 S.E.2d 63, 76 (W. Va. 2010)).

Here, the Hesleps have proffered conflicting evidence concerning whether AFAA and Carter-Shotts exercised sufficient control over Kagimu to satisfy the fourth factor from <u>Paxton</u>. Accordingly, the defendants are not entitled to summary judgment as to Counts Four and Six.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109]**

**V. CONCLUSION**

In conclusion, for the reasons discussed, the Court:

1.  **GRANTS IN PART** the defendants' motion for summary judgment (dkt. no. 109) as to Counts One and Three;

2.  **DENIES IN PART** the defendants' motion for summary judgment (dkt. no. 109) as to Counts Two, Four, and Six.

This case remains on the Court's trial docket for Monday, April 1, 2013.

It is so **ORDERED.**

The Court directs the Clerk of Court to transmit copies of this Order to counsel of record.

DATED: March 11, 2013.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE